# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

BORGWARNER PDS (ANDERSON), L.L.C.,

    Plaintiff,

v.

Case No. 20-10607
HON. DENISE PAGE HOOD

INDUSTRIAL MOLDING CORPORATION,

    Defendant.
_____/

## ORDER GRANTING PLAINTIFF'S
## MOTION FOR TEMPORARY RESTRAINING ORDER
## and NOTICE OF HEARING ON MOTION FOR
## PRELIMINARY INJUNCTION FOR SPECIFIC PERFORMANCE

**I.    INTRODUCTION**

This matter is before the Court on Plaintiff BorgWarner PDS (Anderson), L.L.C.'s ("BorgWarner") Motion for Temporary Restraining Order and Preliminary Injunction ("Motion for TRO"). ECF No. 2. BorgWarner seeks an order "enjoining [Defendant Industrial Molding Corporation ("IMC")] to continue to perform its contractual obligations to supply BorgWarner 100% of its requirements of the 43 Part Numbers at issue (the "Parts") until further order of this Court." *Id.* at Pg 88. On March 6, 2020, BorgWarner filed a Verified Complaint against IMC alleging: Specific Performance (Count I); Declaratory Judgment (Count II); Breach of Contract/Anticipatory Repudiation (Count III); and Promissory Estoppel (Count IV).

## II. BACKGROUND

BorgWarner is a Delaware limited liability company with its principal place of business located in Noblesville, Indiana, and none of its members or parent companies is a citizen of Tennessee or Texas. IMC is a Tennessee corporation with its principal place of business located in Lubbock, Texas. The Court has diversity subject matter jurisdiction pursuant to 28 U.S.C. § 1332 based on complete diversity of the parties and the amount in controversy exceeds $75,000, exclusive of costs, interest, and attorney fees. The Court appears to have personal jurisdiction over IMC based on the contracts at issue in this case, as IMC negotiated them with BorgWarner (a company whose headquarters are in Michigan) and because the contracts provide that "the forum and venue for any legal action or proceeding concerning this Purchase Order will lie in the appropriate federal or state courts in the State of Michigan and [IMC] specifically waives any and all objections to such jurisdiction and venue. ECF No. 1, Ex. 1 at §27. For the same reasons, venue also is proper in this Court.

According to the Complaint and the Motion for TRO, IMC, as "Seller," has been supplying the Parts to BorgWarner, as "Buyer," and shipping them to BorgWarner's facility in San Luis Potosi, Mexico, since approximately January 2017. ECF No. 1, ¶ 7. BorgWarner incorporates the Parts into various automotive assemblies, including solenoid, alternator, and starter assemblies (the "Products") that

BorgWarner supplies to its customer, General Motors. *Id.* at ¶ 8. BorgWarner represents that the Parts and Products are unique to GM and cannot be used anywhere else. IMC supplies the Parts pursuant to BorgWarner blanket purchase orders (the "Purchase Orders"). *Id.* at ¶ 9 (*see* ECF No. 1, Ex. 2 for representative samples of the Purchase Orders). Each Purchase Order contains "Terms and Conditions." *See* ECF No. 1, Ex. 1 (collectively, the Purchase Order and its Terms and Conditions constitute a "Contract").

Each Purchase Order obligates IMC to provide all or a specified percentage of the units that BorgWarner requires for the Part, which BorgWarner initiates by issuing "Releases" on a regular basis indicating both its current, and projected future, volume requirements. *Id.* at ¶ 10. IMC is then required to satisfy the Purchase Order, and IMC currently provides 100% of BorgWarner's requirements for all of the Parts. *Id.* Each of the Purchase Orders recites that it "is governed by and subject to BorgWarner Purchase Order Terms and Conditions." *Id.* at ¶ 11. Those Terms and Conditions provide that, "subject to Buyer's termination rights, this Purchase Order is a requirements contract under which Buyer will purchase and Seller will sell all . . . or . . . a specified percentage . . . of the goods or services specified for the length of the applicable manufacturer's program production life (including extensions and model refreshes) as determined by the original equipment manufacturer or, if applicable, by

Buyer's Customer." *Id.* (citing ECF No. 1, Ex. 1 at §1).

The Terms and Conditions provide that "<u>Deliveries must be made both in quantities and at times specified on the face of this Purchase Order or in Buyer's schedules and time is of the essence</u>. Buyer's delivery schedules are an integral part of the Purchase Order, are governed by these terms and conditions and are not independent contracts." *Id.* at ¶ 12 (citing ECF No. 1, Ex. 1 at §4) (emphasis added). In the event that the Purchase Order terminates for any reason, the Terms and Conditions dictate that IMC must "cooperate in the transition of supply. Seller will continue production and delivery of all goods and services as ordered by Buyer, <u>at the prices and in compliance with the terms of the Purchase Order</u>, without premium or other condition, during the entire period reasonably needed by Buyer to complete the transition to the alternate supplier(s)." *Id.* at ¶ 13 (citing ECF No. 1, Ex 1 at §12) (emphasis added). The Terms and Conditions further state that "[t]his Purchase Order must not be filled at prices higher than those specified on the Purchase Order, unless otherwise agreed to in writing by the Buyer." *Id*. (citing ECF No. 1, Ex. 1 §2).

BorgWarner alleges that, as early as January 3, 2020, IMC began to regularly breach the Contract by failing to deliver an adequate number of Parts to BorgWarner, in violation of its obligation to deliver the Parts "both in quantities and at times specified on the face of this Purchase Order or in Buyer's schedules and time is of the

4

essence." *Id.* at ¶ 14 (citing ECF No. 1, Ex 1 §4). BorgWarner claims to have made IMC aware of these breaches on many occasions, but IMC has ignored these warnings. *Id.* at ¶ 15.

On February 27, 2020, IMC delivered a letter by email to BorgWarner's parent company in Michigan that IMC had received information "indicat[ing] to us that [BorgWarner] may have been, or at least intends to be, sourcing from us less than 100% of [its] needs for the [Parts.]" *Id.* at ¶¶ 16-18 (citing ECF No. 1, Ex 3). IMC objected to this, and insisted that the Contract entitles IMC to be BorgWarner's sole supplier of the Parts for the life of the program and demanded "assurances" that BorgWarner would continue sourcing 100% of its requirements for the Parts from IMC for the life of the program. *Id.* at ¶¶ 18-19. Specifically, the letter demanded "a notarized affidavit from an executive officer of [BorgWarner]," along with several other indications of assurance, rather than "[a] simple statement from someone to that effect." *Id.* at ¶ 19 (citing ECF No. 1, Ex 3).

BorgWarner insists that IMC lacked the legal right to demand such assurances because the Contract does not entitle IMC to a guarantee that it will be BorgWarner's sole source of the Parts for the life of the program. *Id.* at ¶¶ 20-21 (citing ECF No. 1, Ex. 1 §§ 1 and 10, which provide that each Purchase Order is "subject to Buyer's termination rights," such that BorgWarner can "terminate all or any part of this

5

Purchase Order at any time and for any reason by giving written notice to Seller."). For that reason, BorgWarner believes it has no obligation to guarantee IMC that BorgWarner will source 100% of the Parts from IMC for the life of the program. BorgWarner represents that it has not exercised its termination rights. *Id.* at ¶ 21.

IMC's letter asserted that BorgWarner's commitment to source 100% of its Parts from IMC is "critical to the pricing, capital commitments, raw material ordering and prompt supply." *Id.* at ¶ 22 (citing ECF No. 1, Ex 3). BorgWarner alleges that this claim fails to state a reasonable apprehension that a decision to resource the Parts would deprive IMC of BorgWarner's due performance of the Contract or otherwise injure IMC in any legally cognizable way because the Terms and Conditions make adequate provision for any obsolescence that IMC may incur as a result:

> Where articles or materials are to be specifically manufactured for Buyer hereunder and where Seller is not in default, an equitable adjustment shall be made to cover Seller's actual cost, excluding profit, for work-in-process and raw materials as of the date of termination, to the extent such costs are reasonable in amount and are properly allocable or apportionable under generally accepted accounting principles to the terminated portion of this Purchase Order.

*Id.* at ¶ 23 (citing ECF No. 1, Ex 1 §10). BorgWarner alleges that those terms constitute the "entire agreement" between the parties as to this subject matter, such that any additional "assurances" or accommodations demanded by IMC's letter are necessarily unreasonable. *Id.* at ¶ 24 (citing ECF No. 1, Ex 1 §27).

6

IMC's February 27, 2020 letter further stated that "[f]ailure to completely comply will be confirmation of our concerns and entitle us to all remedies provide[d] by the [C]ontract and the Uniform Commercial Code." *Id.* at ¶ (citing ECF No. 1, Ex 3). BorgWarner alleges that such action is inconsistent with IMC's contractual obligations and an anticipatory breach of the Contract. *Id.* at ¶ *Id.* at ¶ 25. IMC indicated that:

> In the interim, ... all purchase orders referred to are suspended immediately, (i) no release not in the system at the beginning of this week and not at this moment accepted by us will be honored until further notice and (ii) our raw material purchasing activity will be modified so as to limit or prevent as much as possible any obsolescence that might be experienced due to this threat.

*Id.* at ¶ 26 (citing ECF No. 1, Ex 3). BorgWarner contends that this refusal to honor its Releases is both a direct and anticipatory breach of the Contract, as IMC "may not terminate this Purchase Order before expiration." *Id.* at ¶ 27 (citing ECF No. 1, Ex 1 §§ 4 and 10). In any event, under the Contract, IMC is obligated to cooperate with BorgWarner to "continue production and delivery of all goods and services as ordered by Buyer," without raising prices. *Id.* at ¶ 28 (citing ECF No. 1, Ex. 1, §12).

On March 3, 2020, BorgWarner emailed IMC, advising that BorgWarner planned to respond to IMC's letter on or before March 6, 2020 (the Court has not been made aware whether such a response was sent to IMC), and reminding IMC that in the interim, "it is important that full shipments of [P]arts continue consistent with the

7

current [P]urchase [O]rders." (emphasis in original).). *Id.* at ¶ 32. The same day, IMC responded in an email, noting the lack of "adequate assurance" from BorgWarner and stating, "That does not mean we [IMC] intend to stop shipping. In fact, we intend to ship what is necessary to avoid a shutdown at your customer to the extent that depends on our product." *Id.* at ¶¶ 29-30 (citing ECF No. 1, Ex 4). For the purported reason of "protecting" itself, IMC stated,

> Until we can get a firm and believable build plan for each part, continued shipping must be via limited, agreed on spot P.O.s. It may be that a C.O.D. regimen is required until those plans can be agreed. However, nonpayment of any outstanding invoice will require additional measures on our part. ... We will not be ordering more raw material until we have the agreed plan in place. We have cancelled raw material orders that could be cancelled without penalty. Failure to address the matter further will force us to shut lines down that we view to be in immediate risk of overproduction."

*Id.* at ¶ 31 (citing ECF No. 1, Ex 4).

On March 4, 2020, IMC sent another email purporting to make other changes to the Contract:

> [IMC is] trying to maintain a normal production and shipping schedule. However, the longer you insist on no transparency the less likely you are to have a comfortable outcome.... If our raw material availability becomes an issue due to your lack of commitment, then we will have trouble supplying even the parts that were routinely on that schedule.

*Id.* at ¶ 33 (citing ECF No. 1, Ex 5). IMC also stated that it was "**aware of a large surge of those parts put in the planning schedule las[t] week and cannot commit**

8

**to satisfying those. Therefore, they have been rejected. . . . In the meantime, while we intend to continue our production and quality monitoring as usual**, parts shipped are shipped WITHOUT WARRANTY OF ANY SORT EXPRESS OR IMPLIED." *Id.* (emphasis added). BorgWarner alleges that IMC does not have the legal or contractual right to make such unilateral alterations to the Contract and that any cancellation of raw material orders and related measures threaten to reduce the already-deficient volume of Parts IMC ships to BorgWarner to the point that BorgWarner may face shortages of the Products it ships to its customers. *Id.* at ¶¶ 34-35.

BorgWarner alleges that, based on IMC's communications noted above, "it will begin to run out of the Parts it needs to supply GM in as little as 1.5 weeks." *Id.* at ¶ 37. On March 5, 2020, BorgWarner representatives sought assurances from IMC about deliveries of BorgWarner's five most critical Parts, and IMC confirmed only three of them. On that basis, BorgWarner expects to run out of one of these parts within one week (on or about March 13, 2020), and to run out of the other within two weeks. *Id.* at ¶ 38.

On March 9, 2020, in conjunction with the Motion for TRO, BorgWarner submitted a proposed order granting the Motion for Temporary Restraining Order. Roughly 90 minutes later, IMC filed "Objections to the Proposed Order" submitted

by BorgWarner, and a proposed order. The proposed order submitted by IMC is substantially the same as the proposed order submitted by BorgWarner in that recognizes that injunctive relief is appropriate, even allowing that IMC generally must continue supplying the Parts to BorgWarner. The proposed orders differ in exactly what "supplying the Parts to BorgWarner" means:

(1) BorgWarner proposes that the Court require that "IMC must continue to meet all of BorgWarner's requirements of all Parts at issue in BorgWarner's Complaint, as stated in the [R]eleases issued by BorgWarner pursuant to the terms of BorgWarner's Purchase Orders. For the avoidance of doubt, this obligation includes the recent increase in volumes that IMC has referred to as a "surge."

(2) IMC proposes that hte Court require that "IMC must use its best efforts to continue to supply, and BorgWarner must pay, for the 4[3] Parts at issue in BorgWarner's Complaint in quantities consistent with historical release schedules."

The Court notes that: (a) in the Motion for TRO, BorgWarner asks the Court to issue an order "requiring IMC to ship the Parts in accordance with the parties' supply agreement," ECF No. 2, PgID 88; and (b) in the brief in support of the Motion for TRO, BorgWarner asks the Court to issue an order "requiring IMC to timely supply BorgWarner with the quantities of the Parts at the times Ordered in the Releases until further order of this Court." ECF No. 2, PgID 111. BorgWarner filed a reply the same afternoon.

III. **ANALYSIS**

10

In this case, IMC has received notice of BorgWarner's Motion for a Temporary Restraining Order and, to an extent, agrees with the relief requested. Based on that notice, the Court considers the following four factors in determining whether to issue a temporary restraining order:

(1) whether the movant has shown a strong or substantial likelihood or probability of success on the merits;

(2) whether the movant has shown that he or she would suffer irreparable harm if the preliminary relief is not issued;

(3) whether the issuance of a preliminary injunction will not cause substantial harm to third parties; and

(4) whether the public interest would be served by the issuance of a preliminary injunction.

*Sandison v. Michigan High School Athletic Association, Inc.*, 64 F.3d 1026, 1030 (6th Cir. 1995); *UASCO Coal Co. v. Carbomin Energy, Inc.*, 689 F.2d 94, 98 (6th Cir. 1982); *Mason County Med. Ass'n v. Knebel*, 563 F.2d 256, 261 (6th Cir. 1977). The standard for injunctive relief is not a rigid and comprehensive test. The four factors are to be balanced, not prerequisites that must be satisfied, as "these factors simply guide the discretion of the court; they are not meant to be rigid and unbending requirements." *In re Eagle-Picher Indus., Inc.* 963 F.2d 855, 859 (6th Cir. 1992).

**A.     Likelihood of Success on the Merits**

The Contracts require IMC to supply BorgWarner with its requirements of the Parts at fixed prices. *See, e.g.* ECF No. 1, Ex. 3 ("These purchase orders are 100% requirements orders for the life of the part ordered."); ECF No. 1, Ex. 1 at §1 ("subject to Buyer's termination rights, this Purchase Order is a requirements contract under which Buyer will purchase and Seller will sell all . . . or . . . a specified percentage . . . of the goods or services specified for the length of the applicable manufacturer's program production life (including extensions and model refreshes) as determined by the original equipment manufacturer or, if applicable, by Buyer's Customer."); ECF No. 1, Ex. 1 at §2 ("This Purchase Order must not be filled at prices higher than those specified on the Purchase Order, unless otherwise agreed to in writing by the Buyer.").

The Court notes that, even if IMC desires to and has the right to terminate one or more of the Purchase Orders, the Terms and Conditions dictate that IMC must "cooperate in the transition of supply[, such that] Seller will continue production and delivery of all goods and services as ordered by Buyer, <u>at the prices and in compliance with the terms of the Purchase Order</u>, without premium or other condition, during the entire period reasonably needed by Buyer to complete the transition to the alternate supplier(s)." ECF No. 1, Ex 1 at §12 (emphasis added).

The Sixth Circuit has recognized the propriety of granting injunctive relief that

consists of ordering a defendant supplier to continue to supply goods when the defendant is the sole supplier of parts to the plaintiff. *See, e.g., TRW Inc. v. Indus. Sys. Assoc. Inc.*, 47 F. App'x 400, 401 (6th Cir. 2002). *See also* MICHIGAN CONTRACT LAW § 14.16 (1998) ("Specific performance is particularly appropriate in the modern automotive industry where manufacturers commonly enter into requirements contracts.").

As the Contracts appear to require IMC to continue to perform its contractual obligations to supply BorgWarner 100% of BorgWarner's requirements of the Parts, the Court finds that BorgWarner is likely to prevail on the merits of its claim seeking specific performance.

**B.      Irreparable Harm**

Regarding the irreparable injury requirement, it is well settled that a plaintiff's harm is not irreparable if it is fully compensable by money damages. *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992). However, an injury is not fully compensable by money damages if the nature of the plaintiff's loss would make damages difficult to calculate. *Id.* at 511-512. "The loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute." *Basicomputer,* 973 F.2d at 512. *See also Mich. Bell Tel. Co. v. Engler*, 257 F.3d 587, 599 (6th Cir. 2001) ("loss of established goodwill may

irreparably harm a company."); *Thermatool Corp. v. Borzym*, 575 N.W.2d 334, 338 (Mich. Ct. App. 1998) ("non-compensable injury for which there is no legal measurement of damages or for which damages cannot be determined with a sufficient degree of certainty.").

The Terms and Conditions provide that "<u>Deliveries must be made both in quantities and at times specified on the face of this Purchase Order or in Buyer's schedules and time is of the essence</u>. Buyer's delivery schedules are an integral part of the Purchase Order, are governed by these terms and conditions and are not independent contracts." *Id.* at ¶ 12 (citing ECF No. 1, Ex. 1 at §4) (emphasis added). BorgWarner has represented that IMC currently provides 100% of BorgWarner's requirements for all of the Parts, ECF No. 1 at ¶ 10, which Parts are then supplied to, and only to, BorgWarner's customer, General Motors. *Id.* at ¶ 8.

BorgWarner notes that, as is standard practice in the automotive industry, it orders the Parts and delivers the Products on a just-in-time basis. *Id.* at ¶ 39. BorgWarner claims that, if BorgWarner's supply of Products to General Motors is interrupted because IMC ceases supply of the Parts, General Motors will have to turn their production lines off, causing "potentially devastating and irreparable consequences." *Id.* at ¶ 40. For purpose of seeking a restraining order, BorgWarner argues that General Motors would not only look to BorgWarner for compensation, but

14

that such an interruption would "inflict lasting damage on BorgWarner's reputation with OEM customers."

Without continued supply of the Parts, BorgWarner's production lines will grind to a halt as soon as March 13, 2020. ECF No. 1, at ¶ 38. Although that may cause a financial impact of millions of dollars in shutdown damages, more important for purposes of the Motion for TRO are: (a) the incalculable losses from being shut out of future supply work with its OEM customers; (b) losing various employees due to a lack of work, and (c) severe damage to BorgWarner's reputation as a reliable, on-time supplier, likely leading to lost goodwill and future business opportunities with other OEMs. All of these possible consequences constitute irreparable harm. *See, e.g., Almetals Inc. v. Wickeder Westfalenstah L. GmbH.*, No. 08-10109, 2008 WL 4791377, at *9 (E.D. Mich. Oct 29, 2008) (granting permanent injunction against automotive supplier where there was no alternative source of supply for the components and plaintiff would lose goodwill and business relationships with customers). The substantial danger and likelihood that BorgWarner will suffer immediate and irreparable harm absent injunctive relief supports the entry of a temporary restraining order.

**C.     Balance of Harms**

As noted above, BorgWarner is likely to sufferable irreparable harm if the

Motion for Temporary Restraining Order is not granted. To the extent that IMC suffers any harm by having to continue to perform its duties under the Contracts, IMC can recover damages. This factor favors BorgWarner.

**D.     Public Interest**

This factor favors BorgWarner, as the public has an interest in having valid contracts enforced and there is no evidence at this time that the Contracts are invalid. *See, e.g., Zimmer, Inc. v. Albring*, No. 08-12484, 2008 WL 2604969, at *9 (E.D. Mich. Jun, 27, 2008); *Superior Consulting Co. v. Walling*, 851 F. Supp. 839, 848 (E.D. Mich. 1994).

**E.     Conclusion**

Because BorgWarner has shown a likelihood of success on the merits and that it will suffer irreparable harm if IMC fails to deliver the Parts in accordance with the Contracts, the Court grants BorgWarner's Motion for a Temporary Restraining Order. IMC must continue to perform under the Contracts and supply the Parts to BorgWarner. Specifically, the Court will enter a temporary restraining order that requires IMC to timely supply, without interruption, BorgWarner with the quantities of the Parts at the times ordered in the Releases, and requires BorgWarner to timely pay IMC for such quantities of the Parts in accordance with the terms of the Contracts, until further Order of the Court. The Court notes that BorgWarner did not argue or

request any language regarding "surges" in its Motion for TRO or brief in support of the Motion for TRO and, therefore, declines to include that language in this Order.

The Court will set a hearing date on BorgWarner's Motion for Preliminary Injunction given that a temporary restraining order expires by its terms within fourteen (14) days, unless IMC consents to a longer time period. Fed. R. Civ. P. 65(b)(2). No security pursuant to Rule 65(c) need be posted by BorgWarner since it is not requesting any performance by IMC other than what is set forth in the Contracts.

## IV. **CONCLUSION**

For the reasons set forth above,

IT IS ORDERED that BorgWarner's Motion for Temporary Restraining Order (filed March 6, 2020) is GRANTED. No security is required to be posted.

IT IS FURTHER ORDERED that pursuant to Fed. R. Civ. P. 65(a), IMC must timely supply, without interruption, BorgWarner with the quantities of the Parts at the times ordered in the Releases, and BorgWarner must timely pay IMC for such quantities of the Parts in accordance with the terms of the Contracts, until further Order of the Court.

IT IS FURTHER ORDERED that BorgWarner serve IMC a copy of the Verified Complaint, BorgWarner's Motion for Preliminary Injunction and this Order, by **Thursday, March 12, 2020**. IMC's response to the Motion for Preliminary

Injunction for Specific Performance must be filed with the Clerk's Office by **5:00 p.m. on Monday, March 16, 2020**, and BorgWarner's reply (if any) must be filed by **5:00 p.m. on Tuesday, March 17, 2020**.

IT IS FURTHER ORDERED that a **hearing on BorgWarner's Motion for Preliminary Injunction for Specific Performance is scheduled for Wednesday, March 18, 2020, at 2:30 p.m.** Proofs will be taken at that time if required by the parties, and the parties so notify the Court.

s/Denise Page Hood
DENISE PAGE HOOD
United States District Judge

DATED: March 11, 2020

TIME OF ISSUANCE: 4:35 p.m.

THE CLERK SHALL FILE THIS ORDER FORTHWITH